**METROPOLITAN PIER & EXHIBITION AUTHORITY for the use and benefit of Pitt–Des Moines, Inc., Plaintiff,**

v.

**Mc3D, INC., et al., Defendants.**

No. 97 C 2126.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 19, 1999.

Lee C. Davis, Robert D. Marshall, Griffin, Cochrane & Marshall, Atlanta, GA, for plaintiff.

Kathleen Marie Banar, Jenner & Block, Chicago, IL, Stephen E. Ray, John S. Mrowiec, Anurag Gulati, Stein, Ray & Conway, Chicago, IL, for defendants.

### *MEMORANDUM AND ORDER*

MORAN, Senior District Judge.

Pitt–Des Moines, Inc. brought this two-count complaint alleging that Metropolitan Pier & Exhibition Authority (MPEA), Mc3D, Inc. (the design/builder), American Home Assurance Company, St. Paul Fire & Marine Insurance Company, Seaboard Surety Company, Federal Insurance Company, United States Fidelity & Guaranty Company, Fidelity and Deposit Company of Maryland, and The Aetna Casualty & Surety Company (collectively known as the sureties) are liable for $15 million in damages as the result of a breach of PDM's subcontract with McCormick Place Contractors (McPC).

## BACKGROUND

MPEA is a municipal corporation created pursuant to the Illinois Metropolitan Pier and Exposition Authority Act, 70 ILCS 210 *et. seq.*, for the purpose of developing the McCormick Place expansion (the project). On December 23, 1991, MPEA hired Mc3D, Inc. (the design/builder) by written contract (the design/build contract) to design and develop the project. Under section 10 of the design/build contract Mc3D was required to obtain a payment bond that would guaranty payment for all materials used and labor performed under the contract, including that of subcontractors. Mc3D obtained this bond from the sureties listed above in the amount of $350,000,000. Mc3D engaged McPC as the general contractor on the project, and McPC in turn hired numerous subcontractors to complete the work. By written agreement (the PDM/McPC subcontract) Pitt–Des Moines agreed to supply and install the structural steel.

During construction, MPEA, McPC and Mc3D made numerous modifications to the project plans. In August 1993, McPC began to send PDM these design changes, requesting that PDM return a cost-impact analysis detailing any additional expenses PDM might incur as a result. Although the PDM/McPC subcontract required that PDM provide a detailed notice of such additional expenses within ten days of such requests, PDM instead sent a letter in response to each change proposal, stating that its costs would be affected but that it could not provide an estimate of the total amount of damage within the notice period because the frequency of the design changes prevented PDM from making a final estimate of its additional costs. PDM claims that it did not itemize or calculate its total cost for the additional work because it assumed that it would reach a total lump sum price for the extras with the contractor after the various design

changes giving rise to the modifications had stopped, as the parties had previously done in making a $15 million amendment to the subcontract with Change Order Three.

At the same time PDM was submitting these letters, it was executing the monthly mechanic's lien waivers (lien waivers) and contractor's affidavits that were required for it to receive progress payments for the work already completed. The lien waivers state, in essence, that PDM has no outstanding claim for materials or labor furnished prior to the waiver's date. Similarly, by executing the contractor's affidavits PDM affirmed that it had no legal or equitable claim for material and labor costs outstanding at the time of execution. The last set of such documents that PDM executed was on November 30, 1995, by which time PDM admits it had completed 96.7% of its performance, and it is undisputed that PDM has been paid for all of the work described in those documents to that date.

Several months after PDM's performance was completed, PDM gave McPC a detailed explanation of the costs it incurred as a result of the design changes and requested an additional 15 million dollars compensation. McPC refused to pay, stating that PDM had failed to comply with the subcontract's notice provisions which required PDM to provide a detailed request for extra compensation within a limited time period after the design change giving rise to the modified cost. PDM then brought this action against McPC, Mc3D and Mc3D's sureties.

Previously McPC moved for summary judgment, arguing that PDM's failure to comply with the subcontract's notice provisions barred any later claim for additional compensation.[1] PDM defended on the grounds that during the course of the subcontract's performance PDM and McPC, by their conduct, modified the contractual

---

1. Mc3D and the sureties make this same argument in their motion for summary judgment. Because we addressed this argument in the context of McPD's motion to dismiss, we do not address it again here.

notice requirement agreeing, instead, that PDM would provide a detailed accounting of its expenses after the flow of the design changes had stopped. This court found that the facts surrounding PDM's and McPC's agreement were materially in dispute and consequently denied McPC's motion for summary judgment. Now, Mc3D and the sureties have moved for summary judgment.

### ANALYSIS

In their motion for summary judgment Mc3D and the sureties argue that the clear and unambiguous lien waivers and contractor's affidavits that PDM executed prevent PDM from seeking to recover for materials and labor provided prior to the date of the last waiver, November 30, 1995. In response, PDM makes several arguments. First, it argues that a mechanic's lien waiver does not waive a subcontractor's right to make a claim on the surety bond, but instead only prevents it from attaching a lien to the property or project at issue. Second, PDM argues that it is the customary practice in the Chicago construction industry for lien waivers to apply only to the work actually stated in the waiver. In other words, although the waivers typically state that the subcontractor is giving up its right to obtain a lien for any work performed prior to the waiver's date, PDM argues that the subcontractor in fact only gives up its right to seek a lien for any amount for the work listed in the wavier. Thus, according to PDM's position, a subcontractor executing such waivers retains the right to pursue compensation for any work performed prior to the waiver's date but not stated in the waiver itself, and consequently PDM's waivers did not apply to any additional or extra work that PDM had performed prior to the date of each waiver, but which had not been described or paid for at the time of the waiver.

The lien waivers that PDM executed on a monthly basis state:

[PDM] waive[s] and release[s] any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, relating to the mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of labor, services, material, fixtures, apparatus or machinery, *furnished to this date* by the undersigned for the above-described premises.

The contractor's affidavits provide in part:
[PDM affirms:] That all waivers are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defeat the validity of said waivers .... [A]nd that the items mentioned include all labor and material required to complete said work according to plans and specifications .... That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

In addition, each contractor's affidavit stated a general description of the work covered by the waiver, the total contract price of PDM's performance, the total amount paid to date, the current payment being made, the total balance owing on PDM's contract, and the date.

█ First, it is clear that in Illinois a mechanic's lien waiver waives a subcontractor's right to pursue a claim on the payment bond. PDM presents no evidence in support of its argument to the contrary and does not cite a single case or provide any affidavits to this effect. Moreover, the only Illinois case that analyzes the issue directly contradicts PDM's position (mem. in opp., at 6). In *William Aupperle & Sons, Inc. v. American Indemnity Co.,* 75 Ill.App.3d 722, 31 Ill.Dec. 523, 394 N.E.2d 725, 727 (1979), the Illinois Appellate Court found that a mechanic's lien waiver waives the right to recover on the surety

bond. Under the law of suretyship, if the surety (who is the secondary obligor under the bond) has to pay a party entitled to payment under the bond, it becomes subrogated to that party's rights against the principal (the party primarily liable for payment). The Illinois court reasoned that a subrogee (the surety) can have no greater right than the subrogor (the party recovering on the bond) and can only enforce only such rights as the subrogor could enforce. *Id.* at 727. Thus, having executed a lien waiver, the subcontractor seeking payment could not proceed against the payment bond because the waiver would block the surety from then pursuing the principal for the amount at issue. *Id.* PDM presents no convincing reason to disregard this law and we consequently find that under Illinois law, as elsewhere, a mechanic's lien waiver generally waives the right to proceed against the payment bond.

 We must now consider whether by executing the lien waivers and contractor's affidavits PDM surrendered the right to pursue the payment bond for work performed prior to the waiver dates but not billed or included in the waiver descriptions nor intended to be covered by the waiver's corresponding periodic payment. Several Illinois cases have touched on this issue. A clear and unambiguous lien waiver is valid and must be enforced according to its terms. *Country Service & Supply Company v. Harris Trust & Savings Bank*, 103 Ill.App.3d 161, 58 Ill.Dec. 599, 430 N.E.2d 631 (2d Dist.1981). Whether any ambiguity exists is a question of law for the courts and, unlike other states, Illinois will not consider extrinsic evidence, including evidence of industry custom, in making this determination. *Id.* Waivers and contractor's affidavits nearly identical to the one in this case have been found clear and unambiguous, and there is no question that those at issue here fall into that category. *Id.* However, this rule applies "only when the party against whose property a lien is sought has relied upon

the waiver of lien in innocence and good faith." *Premier Electrical Construction v. LaSalle National Bank*, 132 Ill.App.3d 485, 87 Ill.Dec. 721, 477 N.E.2d 1249, 1254–55 (1st Dist.1985). Whether there has been such innocent good faith reliance is a question of fact, as are questions of customary practice between parties or within an industry when raised in the context of the effect of a subcontractor's lien waiver. *Id.* at 1255. A party will not be deemed innocent if it obtained the waiver by fraud, *see Country Service*, 58 Ill.Dec. 599, 430 N.E.2d at 635, or if all of the parties knew the waiver did not accurately reflect the current subcontract price and payment status, *see Premier Electrical*, 87 Ill.Dec. 721, 477 N.E.2d at 1255. In determining whether a subcontractor who has provided lien waivers can proceed against the payment bond, the focus of the court's inquiry is to determine whether the parties intended the bond to cover the risk that ultimately gave rise to the claim against the bond, here the possibility that the contractor would not honor its alleged agreement to pay for PDM's extras as a result of design modification. *Chicago Bridge & Iron Company v. Reliance Insurance Company*, 46 Ill.2d 522, 264 N.E.2d 134, 139 (1970) (holding that subcontractor should have the opportunity to prove that there was a construction industry custom for subcontractor to deliver lien waivers before receiving payment, and that the general contractor and owner knew of this practice and failed to act accordingly).

 When we considered McPC's motion for summary judgment we found that there existed a material issue of fact as to whether PDM and McPC modified PDM's notice obligation during their course of performing the subcontract. We consequently denied the contractor's motion for summary judgment. In its motion for summary judgment McPC did not argue that PDM's claim was barred by the lien waivers and contractors' affidavits, as defendants Mc3D and the sureties do here. Had it taken this approach we would have

nonetheless denied its motion because under the authority discussed above McPC would not be considered an "innocent" party. In responding to McPC's motion for summary judgment PDM produced various letters and other correspondence between the parties indicating that McPC was aware that PDM's periodic payment requests did not include amounts needed to cover its extra work on the various design changes implemented since the beginning of the contract. Because McPC does not deny that it received this correspondence, McPC was clearly aware that the mechanic's lien waivers and the contractor's affidavits were not entirely accurate. At a minimum, McPC knew that PDM had uncalculated and consequently unincluded outstanding claims for materials and labor performed in addition to that covered by each individual waiver. Since McPD knew the waivers were inaccurate, McPD is not an innocent party under Illinois law and could not now rely on the waivers to avoid PDM's claims.

■■■ We thus agree with PDM that under the Illinois case law discussed above, PDM should have the opportunity to prove that the party taking the waiver, here the general contractor, understood that the waiver applied only to amounts actually paid, and not expenses PDM incurred but did not bill prior to the waiver date. Because the above cases deal only with owners and general contractors, the only question that remains is whether Mc3D and the sureties are subject to the same argument. Under the payment bond both Mc3D and the sureties agreed to pay for labor and materials furnished by the subcontractors. Mc3D was involved in issuing the various design changes and apparently knew that McPD would ask its subcontractors to estimate what additional costs might be incurred. Mc3D accepted the waivers and contractor's affidavits despite the fact that McPD was being told of

mounting additional costs that PDM claims were not covered by those documents. Accordingly, it is disputed whether Mc3D was "innocent" in this context. With respect to the sureties, it is clear that sureties are subject to the non-personal rights and defenses of the principal. *See Village of Rosemont v. Lentin Lumber Co.*, 144 Ill.App.3d 651, 98 Ill.Dec. 470, 494 N.E.2d 592 (1st Dist.1986). Because there is a material factual dispute over whether Mc3D innocently accepted and relied on the inaccurate lien waivers, neither the sureties nor Mc3D can use them as a defense until PDM has an opportunity to establish the customary usage and meaning of such waivers in the industry.[2]

## CONCLUSION

For the reasons stated above, the motion for summary judgment is denied.

---

2. PDM also argues at length that the sureties suffered no prejudice as a result of the inaccurate lien waivers. Having decided summary judgment is inappropriate on other grounds, it is unnecessary to address that argument.